# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

DENISE MURRAY,           )
                                 )

Plaintiff,              )
                                 )

v.                        )   Docket No. 2:13-cv-00341-JDL
                                 )

KINDRED NURSING CENTERS   )
WEST LLC,              )
d/b/a KINDRED TRANSITIONAL   )
CARE & REHABILITATION   )
KENNEBUNK,          )
                                 )

Defendant.           )

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the court on Kindred Nursing Centers West, LLC's motion for summary judgment pursuant to Fed. R. Civ. P. 56.

## I. BACKGROUND

Kindred operates a short- and long-term rehabilitation therapy and restorative care center in Kennebunk. ECF No. 23 at 1. Denise Murray is a Licensed Practical Nurse who was hired by Kindred in March 2011. *Id.* Murray's employment was terminated a year later in March 2012, following an investigation by Dawn Guptill, Kindred's Director of Nursing, in which Guptill concluded that Murray may have diverted narcotic medicines in violation of Kindred's policies. *Id.* at 6, ¶ 36.

Kindred reported the suspected drug diversion to the Maine Department of Health and Human Services (DHHS) as required by law. *Id.*, ¶ 40. In January 2013,

Murray entered into a consent agreement with the Maine Board of Nursing by which she acknowledged having committed "unprofessional conduct" based on "illegible and substandard documentation, particularly concerning narcotic administration." DHHS's investigation substantiated Kindred's allegation of missing narcotics, but DHHS concluded that the records "could not prove it was the result of one person and medication errors continued after Ms. Murray's termination." ECF No. 21-1 at 64-66. Accordingly, the consent agreement did not find, and Murray did not admit, that she had diverted residents' medications as Kindred had suspected.

While admitting to having made documentation errors, Murray contends that the real reason her employment ended was in retaliation for reports she had made to Guptill of her suspicions that another nurse (hereinafter, "Nurse D") was under the influence of drugs while at work. ECF No. 31 at 16. Murray asserts that Guptill took no action in response to the reports. *Id.* at 3-4. By her amended complaint, Murray alleges that she was unlawfully discriminated against by Kindred in violation of the Maine Whistleblower Protection Act, 26 M.R.S. § 833 (2013), in retaliation for her having reported conditions that negatively impacted the care of the facility's residents. ECF No. 1 at 2-3.

Kindred's motion for summary judgment has two prongs. First, Kindred contends that Murray is judicially estopped from pursuing her whistleblower retaliation claim because she failed to amend her bankruptcy schedules to disclose the existence of the claim in her Chapter 13 bankruptcy case which was initiated in May 2009 and remains pending. ECF No. 22 at 5-12. Second, Kindred argues that

summary judgment is appropriate on Murray's retaliation claim because she cannot demonstrate a causal connection between her alleged protected activity—her reports to Guptill regarding Nurse D—and her termination, either at the prima facie stage or to establish that Kindred's stated reason for her termination was pretextual. *Id.* at 12-18.

## II. LEGAL ANALYSIS

I proceed by (A) considering the applicable summary judgment standards, and then turning to (B) the applicability of judicial estoppel, and (C) whether Kindred is entitled to summary judgment on the merits of Murray's whistleblower retaliation claim.

### A.    SUMMARY JUDGMENT STANDARD

#### 1. Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014). "A dispute is genuine if 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party.'" *Johnson v. University of Puerto Rico*, 714 F.3d 48, 52 (1st Cir. 2013) (*quoting Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has the potential of determining the outcome of the litigation." *Id.* (*quoting Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Johnson*, 714 F.3d at 52. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007) (*citing Clifford v. Barnhart,* 449 F.3d 276, 280 (1st Cir. 2006)); Fed. R. Civ. P. 56(c). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

### 2. Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are not in dispute. *See* Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and supported by a specific record citation. *See id.* The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by

reference to each numbered paragraph of the moving party's statement of material facts[.]" Loc. R. 56(c). The nonmovant likewise must support each denial or qualification with an appropriate record citation. *See id.* The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation. *See id.* The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement. *See* Loc. R. 56(d). Again, each denial or qualification must be supported by an appropriate record citation. *See id.*

Local Rule 56 directs that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Loc. R. 56(f). In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id.*; *see also, e.g., Borges, ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

**B. JUDICIAL ESTOPPEL**

**1. Procedural Background**

Murray and her husband initiated their Chapter 13 bankruptcy case in May 2009. ECF No. 31 at 11. As confirmed, the Murrays' Chapter 13 plan required that they make monthly payments of $440 for a term of 60 months, toward their secured debts. ECF No. 23 at 10. The Plan also directed the Trustee to pay $2,063.45 of the $80,781.20 in unsecured claims. ECF No. 23 at 10, ¶ 69. In September 2013, the Murrays moved the Bankruptcy Court to approve a modification of their mortgage loan in order to "allow the Debtors to retain their home as the mortgage payments will be lower." ECF No. 23-1 at 26, ¶ 4. The court granted the motion by an order dated September 18, 2013. *Id.* at 28.

This action against Kindred was initiated when Murray filed her complaint with the Maine Superior Court in August 2013, and Kindred removed the action to Federal Court in September 2013. ECF No. 31 at 11. Murray's failure to disclose her claim against Kindred to the Bankruptcy Court first surfaced during her deposition in this case held in January 2014. ECF No. 21-1 at 36. Murray was asked whether her mortgage lender had initiated foreclosure proceedings against her, to which Murray responded that she was currently "in Chapter 13." *Id.*

In March 2014, Kindred's counsel informed Murray's counsel that he believed that Murray's whistleblower claim was barred by the doctrine of judicial estoppel. ECF No. 26-2, at 2. Soon thereafter, Murray's bankruptcy attorney notified Peter Fessenden, the Bankruptcy Trustee, of the existence of this action. In response,

Fessenden estimated that if Murray recovered money as a result of her claim against Kindred, and absent additional attorney fees associated with this action, he expected that approximately $60,000 would be required to "fulfill all Chapter 13 requirements[,]" with any recovery above that amount going to Murray. ECF No. 27-1, at 1.

Kindred filed its motion for summary judgment on May 21, 2014. *See* ECF No. 22. Murray filed an amended Schedule B to her Chapter 13 petition in the Bankruptcy Court on June 10, 2014, which formally identified the whistleblower claim as an asset of her bankruptcy estate. ECF No. 27-2. In her affidavit filed on June 11, 2013, in opposition to Kindred's motion for summary judgment, Murray stated: "I had no idea of the need to disclose [this] present lawsuit to the Bankruptcy Court. I had absolutely no intent to ever conceal the present lawsuit as an asset to the Bankruptcy Court." ECF No. 30 at 3.

## 2. The Parties' Arguments

Kindred bases its judicial estoppel argument on Murray's failure to disclose her whistleblower claim to the U.S. Bankruptcy Court by failing to amend her filings in the Chapter 13 proceeding once she first became aware of her claim against Kindred at the time of her termination in March 2012. ECF No. 22 at 6-7. Because Murray's bankruptcy estate consists not only of non-exempt property she had as of the commencement of the bankruptcy, but also after-acquired property, Murray was under an "absolute duty to report whatever interests [she] hold[s] in property" and to amend her bankruptcy schedules as her circumstances changed. *See Wood v. Premier*

*Capital, Inc. (In re Wood)*, 291 B.R. 219, 226 (B.A.P. 1st Cir. 2003). Kindred asserts that Murray's failure to amend her asset schedules to disclose her whistleblower claim, and her simultaneous pursuit of the claim in this court, are directly inconsistent positions. ECF No. 22 at 7-8.

Kindred further contends that the Bankruptcy Court necessarily accepted Murray's "position taken in the form of omissions from bankruptcy schedules," *Guay v. Burack*, 677 F.3d 10, 18 (1st Cir. 2012), as Murray's Chapter 13 Plan remained in effect and failed to account for this action as a potentially valuable asset, even after Murray filed it in August 2013, and obtained additional relief from the Bankruptcy Court in September 2013. ECF No. 22 at 8-10. Kindred contends that judicial estoppel should be applied because Murray "stood to gain an unfair advantage by concealing this claim from her creditors." *Id.* at 10.

Murray does not dispute that she failed to amend her Chapter 13 asset schedules prior to June 2014. She argues that judicial estoppel is unwarranted because she acted unintentionally, there was no resulting prejudice to the bankruptcy proceeding, and, if judicial estoppel is imposed, her bankruptcy estate will lose a potentially valuable asset—any recovery resulting from this action—to the detriment of her unsecured creditors, and Kindred will receive a windfall in the form of the dismissal of this action without having had to defend it on the merits. ECF No. 31 at 18-19.

### 3. Elements of Judicial Estoppel

As the parties agree, the First Circuit's decision in *Guay v. Burack, supra*, provides the framework for analyzing Kindred's claim of judicial estoppel. In that case, the Guays, a married couple, filed a Chapter 11 bankruptcy proceeding in September 2008 that was converted to a Chapter 7 proceeding in June 2009. *Id.* at 13. In June and July 2009, the Guays filed separate suits under 42 U.S.C. § 1983 against a state police detective and other defendants in federal court. *Id.* at 14. The Guays failed to disclose the existence of the federal suits in the Bankruptcy proceeding until January 2010 in a report of unpaid Chapter 11 claims. *Id.* at 14-15. The Chapter 7 Trustee filed a notice abandoning the lawsuits as burdensome and of inconsequential value to the estate. None of the Guays' creditors objected. *Id.* at 15. In November 2010, the District Court, adopting the recommended decision of the magistrate judge, granted summary judgment against the Guays on the basis of judicial estoppel for their failure to disclose their claims in their bankruptcy proceeding. *Id.*

The First Circuit affirmed the grant of summary judgment, explaining that judicial estoppel prevents "a litigant from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding." *Id.* at 16 (quotations omitted). Judicial estoppel "safeguard[s] the integrity of the courts by preventing parties from improperly manipulating the machinery of the justice system[, and a] party is not automatically excused from judicial estoppel if the earlier statement was made in good faith." *Id.*

(quotations omitted). The court identified two required, and one discretionary conditions relevant to the application of the judicial estoppel:

> There are two generally agreed-upon conditions for the application of judicial estoppel. First, the estopping position and the estopped position must be directly inconsistent, that is, mutually exclusive. Second, the responsible party must have succeeded in persuading a court to accept its prior position. There is also a third oft-considered factor that asks whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. We generally have not required a showing of unfair advantage. Where unfair advantage exists, however, it is a powerful factor in favor of applying the doctrine.

*Id*. at 16-17 (citations and quotations omitted). The court specifically observed, "it is well-established that a failure to identify a claim as an asset in a bankruptcy proceeding is a prior inconsistent position that may serve as the basis for application of judicial estoppel, barring the debtor from pursuing the claim in a later proceeding." *Id*. at 17 (quotations omitted).

### a. Adoption of Inconsistent or Mutually Exclusive Positions

Applying the *Guay* conditions here, there is no doubt that Murray adopted mutually exclusive positions in her bankruptcy proceeding and in this action by her failure to disclose the existence of her whistleblower claim in her bankruptcy proceeding at or near the time it arose in March 2012, and again when she filed her charge of discrimination with the Maine Human Rights Commission in August 2012. Murray's failure to amend her asset schedules to disclose the whistleblower retaliation claim to the Bankruptcy Court prior to June 2014, and her formal pursuit of that claim beginning with her complaint to the Maine Human Rights Commission

in August 2012, were directly inconsistent positions that satisfy the first condition of judicial estoppel.

### b. Judicial Acceptance of the Prior Position

A bankruptcy court is considered to have accepted "a position taken in the form of omissions from bankruptcy schedules when it grants the debtor relief, such as discharge, on the basis of those filings." *Guay*, 677 F.3d at 18. Judicial acceptance of a party's prior position does not require "that the party against whom the judicial estoppel doctrine is to be invoked must have prevailed on the merits. Rather, judicial acceptance means only that the first court has adopted the position urged by the party, either as a preliminary matter or as part of a final disposition." *Reynolds v. Comm'r of Internal Revenue*, 861 F.2d 469, 473 (6th Cir. 1988) (internal quotations omitted). "[W]hen a bankruptcy court—which must protect the interests of all creditors— approves a payment from the bankruptcy estate on the basis of a party's assertion of a given position, that . . . is sufficient judicial acceptance to estop the party from later advancing an inconsistent position." *White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 479 (6th Cir. 2010) (internal quotations omitted).

Here, Murray's Chapter 13 bankruptcy plan was confirmed by the Bankruptcy Court in August 2009 based upon her and her husband's assets and income at that time, ECF No. 23-1 at 4, and was not subject to reconsideration based on the accrual of her claim against Kindred in March 2012. *See* ECF No. 23-1. As was true in *Guay*, Murray's informal notification to the Bankruptcy Trustee of the claim in March 2014 did not relieve her of her duty to amend her asset schedules filed with the Bankruptcy

Court. By failing to inform the Bankruptcy Court of her action against Kindred, Murray effectively received bankruptcy relief in reliance on an earlier inconsistent statement. She received additional relief from the Bankruptcy Court, again in reliance on her inconsistent statement, when she moved for and received the Bankruptcy Court's approval to modify her mortgage loan without having disclosed the existence of this lawsuit, which had been filed the month before.

### c. Unfair Advantage or Unfair Detriment

As explained in *Guay*, the third factor—whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped—is not a required element, but is appropriately considered. *Guay* at 16. Kindred contends that Murray stood to gain an unfair advantage by concealing this claim from her creditors because she placed herself in a position to retain any benefit, such as a settlement payment or judgment, to the detriment of the bankruptcy estate and the unsecured creditors. ECF No. 22 at 10. This unfairness was never realized, however, because Murray disclosed the existence of this suit to the Bankruptcy Court before any actual benefit arose. *See* ECF No. 29-1. Accordingly, Murray does not stand to receive an unfair advantage if judicial estoppel is not applied.

### d. Other Equitable Considerations and Conclusion

Murray stresses that it would be inequitable to apply judicial estoppel on the facts presented because she did not know that she had a duty to disclose this action

to the Bankruptcy Court and, therefore, her adoption of inconsistent positions was unintentional.  ECF No. 31 at 19.

As framed in *Guay*, the required conditions giving rise to judicial estoppel do not explicitly include whether the party's adoption of an inconsistent position was intentional, and the opinion observed that "deliberate dishonesty is not a prerequisite to application of judicial estoppel."  677 F.3d at 20, n.7 (1st Cir. 2012) (citing *Schomaker v. United States*, 334 Fed. Appx. 336, 340 (1ˢᵗ Cir. 2009)).  Other courts have recognized that the "intentional contradictions, not simple error or inadvertence" are required.  *Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269, 1275 (11ᵗʰ Cir. 2010) (quoting *Am. Nat'l Bank of Jacksonville v. FDIC*, 710 F.3d 1528, 1537 (11ᵗʰ Cir. 1983); *see also Ah Quin v. County of Kauai Dep't of Transp.*, 733 F.3d 267, 276-77 (9th Cir. 2013).  In *Ah Quin*, a divided panel of the Ninth Circuit concluded that where a plaintiff-debtor fails to disclose a lawsuit in its bankruptcy petition, courts "must determine whether the omission occurred by accident or was made without intent to conceal [and the] relevant inquiry is not limited to the plaintiff's knowledge of the pending claim and universal motive to conceal a potential asset."  *Id.;  but see In re Coastal Plains, Inc.*, 179 F.3d 179, 210 (5th Cir. 1999) (concluding that "the debtor's failure to satisfy its statutory duty is 'inadvertent' only when, in general, the debtor either lacks knowledge of the undisclosed claims or has no motive for their concealment.").

In *Guay*, the Court also explicitly raised, but left unanswered whether parties "who fail to identify a legal claim in bankruptcy schedules may escape the application

of judicial estoppel if they can show that they 'either lack[ed] knowledge of the undisclosed claims or ha[d] no motive for their concealment." *Guay*, 677 F.3d at 20 (quoting *Eastman v. Union Pac. R.R. Co.*, 493 F.3d 1151, 1157 (10th Cir. 2007)). The Court noted, however, that the District Court had found that the plaintiffs had a "motive to conceal" their civil lawsuits from the Bankruptcy Court, and that the District Court had "analogized the Guays' conduct to that of the debtors in *Payless Wholesale Distribs., Inc. v. Alberto Culver (P.R.) Inc.*, 989 F.2d 570, 571 (1st Cir. 1993)." *Guay* at 20, n.8.

In *Payless*, the plaintiff sought Chapter 11 Bankruptcy relief from its creditors making no mention of its claims against the defendants, and then, two years later filed a complaint against the defendants asserting that its bankruptcy was "'a direct result of the conspiratorial acts of defendants.'" 989 F.2d at 571. The Court observed that "[e]ven a cursory examination of the claims shows that defendants should have figured in both aspects of the Chapter 11 proceedings, and that Payless could not have thought otherwise. The brazenness of its ambivalence is illustrated by its present assertion that the statute of limitations had not run because it had been tolled by the pendency of the Chapter 11." *Id.* Judicial estoppel was required in view of what was described as "an unacceptable abuse of judicial proceedings." *Id. See also Schomaker v. U.S.*, 334 Fed. Appx. 336, 339-340 (1st Cir. 2009) (upholding judicial estoppel where plaintiff had claimed in his bankruptcy petition that a computer was exempt property because it was subject to civil forfeiture by the Federal

government, and then sought damages against the Federal government based on its seizure of the computer).

Judicial estoppel is a discretionary remedy. *Guay* at 15-16. *Payless* demonstrates that when weighing whether an equitable remedy such as judicial estoppel should be applied, it is difficult to avoid examining the nature and extent of the offending party's culpability. 989 F.2d 570. Whether a plaintiff-debtor made an innocent mistake or an intentional omission may take on added significance where there will be no unfair benefit or detriment if judicial estoppel is denied. Simple fairness suggests that a court entertaining the dismissal of a potentially meritorious claim on the basis of judicial estoppel should not turn a blind eye to whether the plaintiff-debtor's failure to disclose an after-acquired claim was intentional or not.

In this case, the two core conditions for judicial estoppel—an inconsistent position and judicial reliance—are demonstrated. If that were the end of the analysis, Murray's complaint would properly be dismissed. However, I also conclude that no unfair benefit or detriment will flow from the denial of judicial estoppel. In addition, there is no direct evidence demonstrating that Murray's failure to disclose was intentional, nor am I persuaded that, on this record before me, there is sufficient evidence from which to infer intentional conduct on her part. Because I conclude that it would be unjust to dismiss Murray's complaint on the basis of judicial estoppel, I decline to do so.

## C.    MURRAY'S WHISTLEBLOWER RETALIATION CLAIM

To prevail on a claim of unlawful retaliation under the Whistleblower Protection Act ("WPA"), Murray must prove that: "(1) she engaged in activity protected by the WPA; (2) she experienced an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action." *Walsh v. Town of Millinocket*, 2011 ME 99, ¶ 24, 28 A.3d 610; *see also Winslow v. Aroostook County*, 736 F.3d 23, 30 (1st Cir. 2013).  Summary judgment motions involving WPA claims are evaluated with the "shifting burdens" analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Thus, once Murray presents prima facie evidence of the three elements, Kindred assumes the burden of producing prima facie evidence of a legitimate, non-retaliatory reason for her discharge, after which the burden returns to Murray to produce prima facie evidence that the reason offered by Kindred is pretextual.  *See Fuhrmann v. Staples the Office Superstore East, Inc.*, 2012 ME 135, ¶ 13, 58 A.3d 1083; *Stanley v. Hancock County Comm'rs*, 2004 ME 157, ¶ 14, 864 A.2d 169.

Kindred acknowledges that, for purposes of summary judgment, there are triable issues of fact concerning the first two of the three elements of Murray's claim: That she engaged in protected activity by allegedly reporting her concerns about Nurse D to her supervisor, Dawn Guptill, and that her termination is an adverse employment action.  ECF No. 22 at 13.  Kindred contends that summary judgment is appropriate because Murray cannot demonstrate a causal connection between her alleged protected activity and her termination at the prima facie stage, and that she

cannot establish that Kindred's legitimate reason for her termination was pretextual. *Id*. at 13-14, 18.

### 1. Causal Connection Between the Protected Activity and the Adverse Employment Action

To demonstrate a causal connection, Murray must show that her reports regarding Dube were a "substantial factor" or a "motivating factor" in the elimination of her position. *See Walsh*, 2011 ME 99, ¶ 24, 28 A.3d 610 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Stanley*, 2004 ME 157, ¶¶ 12, 24, 864 A.2d 169; *see also Wells v. Franklin Broadcasting Corporation,* 403 A.2d 771, 773 (Me. 1979) (stating that the inquiry in an employment discrimination claim is whether the discrimination itself "was a substantial, even though perhaps not the only, factor motivating the employee's dismissal."). Proof by an employer of other reasonable grounds for an employee's termination does not relieve the employer from liability, but "the protected whistleblowing activity must be a but-for cause of the employer's decision to terminate employment." *Caruso v. The Jackson Laboratory*, 2014 ME 101, ¶ 17, --- A.3d ---; (citing *Walsh,* 2011 ME 99, ¶ 25) (equating "the motivating factor" and "substantial factor" standard with "but-for" causation under WPA).

Temporal proximity alone is sufficient "to meet the relatively light burden of establishing a prima face case of retaliation." *Halkett v. Corr. Med. Servs., Inc.*, 763 F. Supp.2d 205, 222 (D. Me. 2011) (collecting cases regarding the sufficiency of temporal proximity in establishing a prima facie case of retaliation"). In addition, the employer's alleged nondiscriminatory reason for taking an adverse employment

action is not considered when assessing the employee's prima facie case. "To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination." *Velez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441, 448 (1st Cir. 2001) (quotation omitted).

The Law Court has held that a temporal proximity of less than two months between the protected activity and the adverse employment action is sufficient to satisfy the causal link element at the prima facia stage. *Fuhrmann*, 2012 ME 135, ¶ 16, 58 A.3d 1083. Here, the last protected activity alleged by Murray—her final report regarding Nurse D to Guptill—took place about a week before her termination. ECF No. 23 at 8, ¶ 54. Based on the temporal proximity between Murray's last alleged protected activity and the termination of her employment, Murray satisfies the third required prima facie element.

### 2. Kindred's Legitimate, Non-Retaliatory Reason for Murray's Termination

It is equally apparent that Kindred has met its burden of producing evidence of a legitimate, non-retaliatory reason for Murray's termination. The evidence, which is largely undisputed, shows that Guptill received reports and reviewed records that gave her a basis to conclude that Murray had diverted Oxycodone and/or failed to properly document the administration of Oxycodone to several residents.[1] In addition,

---

[1] Guptill observed that Murray was the only nurse to have documented administering pain medication to a Kindred resident ("Resident 1") between Monday, February 20 and Friday, March 9, 2012. ECF No. 22 at 3, ¶ 20. In addition, Murray documented that she had administered Oxycodone to another resident ("Resident 2") on March 8, 2012 at 5:30 p.m., but Resident 2 denied having received that

18

Murray acknowledges that her documentation regarding the administration and handling of those medications was substandard and warranted the discipline imposed by the Board of Nursing. ECF No. 21-1 at 64-66. The burden therefore returned to Murray to produce prima facie evidence that the reason offered by Kindred is a pretext for unlawful retaliation.

### 3. Evidence of Pretext

Murray asserts that a reasonable fact-finder might disbelieve the lawful, non-discriminatory reason given by Kindred for several reasons in addition to the temporal proximity between her alleged whistleblowing and her termination. *See Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 170 (1st Cir. 1993) (recognizing "that temporal proximity *may* give rise to a 'suggest[ion] of retaliation,' [but] that 'suggest[ion]' is not necessarily conclusive[, and] that it is the employee's burden to show pretext, sufficient to survive summary judgment.").

First, Murray contends that Kindred's explanation for why it terminated her has been inconsistent because she was originally told that she was terminated for "drug diversion," but Kindred has also characterized the reason as "suspected drug

---

medication. *Id*. at 4, ¶¶ 22, 23. Murray documented administering another resident ("Resident 3") medication at 18:00 (6:00 p.m.), at least three hours *after* Resident 3's discharge earlier that day. *Id*., ¶ 26. Murray documented administering medication to another resident ("Resident 4") on February 2, 2012, but the two prior entries by other nurses showed that Resident 4 had received medication on February 3 and 4, meaning that Murray's documentation was out of sequence and she had to have recorded the February 2 administration on or after February 4. *Id*. at 5, ¶ 30. Murray documented having "punched" medication in error without obtaining the required second signature and without indicating what was done with the wasted medication. *Id*. at 4-5, ¶ 27. In addition, Guptill observed that Murray's signature varied on documentation and that Murray had altered administration times on resident records. *Id*. at 5, ¶ 28.

diversion." ECF No. 31 at 15. These explanations may be distinct, but they are not substantially different and do not provide a reasoned basis for a finding of pretext.

Second, Murray contends that the information relied upon by Dawn Guptill to conclude that Murray had diverted drugs is "extremely weak [and] filled with disputed facts, such as the mental stability of Residents 1 and 2." *Id*. at 15-16. She contends that although Guptill testified that Residents 1 and 2 were alert and oriented, she "has submitted evidence that Resident's 1 and 2 were not alert and orientated. A jury could thus view the evidence as severely undermining the assertion that Plaintiff engaged in drug diversion and thus further evidence of pretext." *Id*. at 16. Contrary to this contention, however, Murray testified at her deposition that Residents 1 and 2 were both alert at times and not alert at other times. ECF No. 21-1, at 31. Thus, Murray's own testimony does not support her assertion that neither Resident 1 nor Resident 2 could have been sufficiently alert to provide information upon which Guptill relied. Even if Residents 1 and 2 were mistaken when they denied having received medication from Murray, there is no evidence which shows that Guptill was compelled to disbelieve them.

Third, Murray contends that "[a] trier of fact could thus reasonably conclude that the drug diversion allegation is weak and further evidence of pretext." ECF No. 31 at 16. Murray's characterization of her documentation practices as merely "sloppy" contradicts the undisputed fact that she entered into a consent agreement with the Maine Board of Nursing in which she admitted that her documentation practices

violated State licensing laws, and that she was properly disciplined on that basis. *See* ECF No. 21-1 at 64-65.

Fourth, Murray asserts that a reasonable fact-finder might find Kindred's explanation for her termination to be pretextual because the investigation performed by DHHS did not substantiate Kindred's conclusion that Murray had diverted drugs. ECF No. 31 at 16. The DHHS investigation did not exonerate Murray, however, but instead concluded that because there was evidence of drugs being diverted at Kindred's facility after Murray was terminated, the investigator did not find sufficient evidence to conclude that Murray had committed any or all of the earlier diversions. ECF No. 21-2 at 15. Most importantly, for purposes of summary judgment, the fact that the diversion of drugs continued after Murray's termination is information that could not have been known by Guptill at the time she terminated Murray and does not, therefore, suggest that her stated conclusion was knowingly false and, therefore, a pretext for retaliation.

Fifth, Murray contends that evidence that Guptill took no actions in response to her suspicions that Nurse D was working under the influence of drugs, could lead a jury to reasonably conclude that Guptill terminated her employment in order to protect Nurse D. ECF No. 31 at 16. Guptill explained that she took no action because she never received most of the reports Murray claims to have made to her. ECF No. 25 at 3, ¶ 17. However, accepting Murray's contentions as true, there is no reasonable inference that can be drawn connecting Murray's reports regarding Nurse D, to Guptill's decision to terminate Murray. The only indication in the summary

judgment record that suggests a connection between Murray's termination and Guptill's alleged failure to act in response to Murray's reports about Nurse D, appears in paragraph 57 of Kindred's Statement of Undisputed Material Facts, in which Murray admitted: "Plaintiff speculated at her deposition that Ms. Guptill may have wanted to protect [Nurse D] because she was the only second shift supervisor." ECF No. 23 at 9, ¶ 57. Speculation is, however, an insufficient basis to avoid summary judgment. In opposing summary judgment, "a nonmovant cannot rely merely upon conclusory allegations, improbable inferences, and unsupported speculation[,]" *Pina v. The Children's Place*, 740 F.3d 785, 796 (1st Cir. 2014) (internal quotations omitted). Furthermore, "conjecture cannot take the place of proof in the summary judgment calculus." *Id.* at 799 (quoting *Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 31 (1st Cir. 2007). Here, there is no evidentiary basis from which a fact-finder could rationally infer that Guptill would fabricate a case of drug diversion against Murray in order to protect Nurse D because Nurse D was the only second shift supervisor. Such an inference assumes, without any factual support, that there was no other nurse available to replace Nurse D on a temporary or permanent basis. In short, the inferential leap required to connect Murray's termination to Guptill's failure to take disciplinary action against Nurse D is far too great and, therefore, unreasonable.

Sixth, Murray contends that evidence that Guptill refused to meet with her in person after informing her by telephone that she was terminated, is evidence of discriminatory animus. ECF No. 31 at 16. There is no other evidence from which a fact-finder might conclude that Guptill's refusal to meet with Murray, an employee

she had just terminated, was unreasonable, or that Kindred treated Murray's termination any differently from the termination of other employees suspected of diverting drugs.

Finally, Murray asserts that the medical records contained additional illegible and inconsistent entries made by other nurses, and that there is no evidence Kindred disciplined other nurses on this basis. *Id.* Murray does not identify, however, which other entries qualify as illegible and inconsistent; whether they relate to the administration of narcotic medications; and whether, as was the case with Murray, the entries qualify as violations of professional licensing standards.

## IV. CONCLUSION

For the foregoing reasons, Kindred's Motion for Summary Judgment is GRANTED.

**SO ORDERED.**

**DATED THIS 8TH DAY OF September, 2014**

**/s/ Jon D. Levy**
**United States District Judge**